UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE CLEARING CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> FINANCIAL AND ENERGY EXCHANGE LIMITED, <br><br> Defendant. | No. 09 C 5383 <br> Judge James B. Zagel |

**MEMORANDUM OPINION AND ORDER**

**I. BACKGROUND**

In 2006, Defendant Financial and Energy Exchange Limited ("FEX"), an Australian public company with its principal business in Sydney, had begun building the infrastructure for the FEX Exchange, a commodities and energy futures and options exchange also based in Sydney. Australian law requires such an infrastructure to include clearing and settlement services for the listed products. FEX decided to out-source these services and contacted Plaintiff The Clearing Corporation ("CCorp"), a derivatives clearing organization that provides clearing and settlement services for futures markets across the United States. CCorp is a Delaware corporation, with its principal place of business in Chicago, Illinois.

On August 1 and 2, 2006, FEX's Chief Executive Officer and Executive Director Brian Price flew to Chicago to meet with CCorp executives in order to discuss CCorp's capability to provide clearing services for FEX. One month later, the parties entered into a Memorandum of Understanding in Respect of Services ("MOU"), in which CCorp agreed to "design the clearing and settlement services to support FEX products, and to deliver a design study document." The

MOU noted that, based on their discussions and the meetings held in Chicago, "the parties have identified a 'good fit' between the organizations[,]" and the outcome from the study would serve as a basis for the parties to negotiate a definitive agreement.

Over the next year, CCorp conducted the design study and had weekly telephone meetings with FEX. FEX paid for the study by wiring money to CCorp's Chicago bank account, and in February and September 2007, FEX sent independent contractors to Chicago several times in connection with the study, to determine whether CCorp was capable of providing clearing and settlement services. On October 13, 2006, the parties entered into a Confidentiality Agreement, which states that it is to "be governed and construed in accordance with the internal laws of the State of Illinois."

On April 13, 2007, FEX's Executive Chairman, Ted Pretty, traveled to Chicago to meet with CCorp executives. CCorp maintains that the purpose of this meeting was to negotiate the terms of the Clearing Services Agreement ("CSA"), and that at the meeting the parties agreed that FEX would pay CCorp a $1 million implementation fee and a $2 million annual fee. CCorp also notes that at the meeting, the parties agreed to promptly enter into a binding Letter of Intent ("LOI"). FEX disputes this account of events and contends that no contract terms were reached at the meeting and that negotiations continued with FEX in Australia until the LOI was signed on May 11, 2007. In the LOI, the parties agreed to the $1 million and $2 million fees, and that they would promptly negotiate a definitive CSA.

The CSA was executed on October 31, 2007. As part of the CSA, FEX agreed to pay CCorp a $1 million implementation fee and a $2 million Annual Processing Fee payable in quarterly installments of $500,000. The Annual Processing Fee was payable by FEX in advance

of each quarter, with the first payment due on June 1, 2008.[1] The CSA also contains an Illinois choice of law provision, language that indicates that certain services will be conducted in the United States, and a requirement that FEX provide CCorp with recommended settlement prices "no later than 2:40 a.m. and 12:30 p.m. (Chicago time) on each business day."

In November 2007, FEX officers Brian and Tom Price traveled to Chicago and met with CCorp in regard to performance under the agreement, including issues such as CCorp's operations and accounting procedures, and FEX's sales and marketing. From August through December 2008, FEX and CCorp had daily telephone meetings in connection with the agreement. Additionally, FEX sent more than one thousand emails to CCorp personnel relating to the design study.

In July 2008, FEX requested that CCorp extend the date for payment of the first quarterly installment to November 1, 2008. In exchange for this accommodation, FEX offered to pay CCorp a $450,000 Delayed Processing Fee payable in five monthly installments of $90,000. CCorp agreed and the deal was memorialized on August 25, 2008 in Amendment No.1 to the CSA.

On October 1, 2008, CCorp invoiced FEX for the first quarterly installment of $500,000. Despite the fact that by November 5 FEX had still not launched or received a market license from the Australian government, FEX sent CCorp an email stating that it "will **NOT** be requesting a variance of the $500k quarterly payment." (emphasis in original). On November

---

[1] According to the CSA, the first quarterly installment was due on the earlier of: (1) the Launch Date; (2) ninety (90) days after the receipt of a market license to FEX; or (3) June 1, 2008. The Launch Date is defined as "date that FEX makes available for trading an FEX Listed Product on the FEX Exchange for trading[.]"

12, 2008, FEX made a payment of $166,647 to CCorp. After the application of a $40 previous overpayment, the outstanding balance on the first quarterly payment is $333,313. Over December and January, FEX expressed its commitment to meeting its obligations, however, the $333,313 balance remains outstanding.

On January 2, 2009, CCorp sent FEX another invoice for $500,000. FEX admitted its payment obligation for this invoice, but it too remains unpaid. The total amount CCorp claims it is owed on the past due invoices is $833,313. In addition to seeking damages in this amount, CCorp is also seeking a declaratory judgment that it properly terminated the CSA due to nonpayment, and that the non-compete provision contained therein does not survive termination of the CSA.

On November 6, 2009, Defendant FEX moved to dismiss the claims against it for lack of jurisdiction. According to FEX, this court can exercise neither specific nor general jurisdiction over FEX. For the following reasons, Defendant's motion to dismiss is denied.

## II. STANDARD OF REVIEW

A district court exercising diversity jurisdiction may only exercise personal jurisdiction over a defendant if an Illinois state court would have such jurisdiction. *RAR*, *Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1275 (7th Cir. 1997). The Illinois long-arm statute subjects a nonresident defendant to jurisdiction in Illinois in several circumstances, such as if the nonresident has conducted a business transaction in Illinois, and the plaintiff's claim arises from that specific act. 735 IL. COMP. STAT 5/2-209(a)(1) (2008). The statute also includes a "catch-all" provision permitting a court to exercise jurisdiction on any basis permitted by the Illinois Constitution or the United States Constitution. 735 IL. COMP. STAT 5/2-209 (c); *Citadel Group*

*Ltd. v. Washington Regional Medical Center*, 536 F.3d 757, 760-61 (7th Cir. 2008). A federal district court can exercise two types of personal jurisdiction over an out-of-state defendant like FEX - general and specific. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002).[2]

Under either the general or specific rubric for exercising personal jurisdiction, the Fourteenth Amendment Due Process Clause requires that Defendant have "minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice." *Id.* at 716 (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)). Defendant must have "purposefully established minimum contacts within the forum State" in order for the exercise of personal jurisdiction to be reasonable and fair. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). Crucial to the minimum contacts analysis is a showing that FEX "should reasonably anticipate being haled into court [in the forum State]," *id.* at 474 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)), because Defendant has "purposefully avail[ed] itself of the privilege of conducting activities" there. *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

As Plaintiff, CCorp has the burden of demonstrating the existence of personal jurisdiction. *GCIU-Employer Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1023 (7th Cir. 2009). Because I am deciding this issue based on written submissions, CCorp must establish a prima

---

[2] A district court exercising diversity jurisdiction may only exercise personal jurisdiction over a defendant if personal jurisdiction would be proper in an Illinois court. *Hyatt*, 302 F.3d at 713. The Illinois long-arm statute, 735 ILL. COMP. STAT. 5/2-209(c) (2008), streamlines the analysis by allowing Illinois courts to exercise personal jurisdiction up to the limits of the United States Constitution. *Hyatt*, 302 F.3d at 714-15. When contacts between the defendant and Illinois are sufficient to satisfy due process under the state and federal constitutions, no further inquiry is necessary to satisfy the statute. *Bombliss v. Cornelsen*, 824 N.E.2d 1175, 1179 (Ill. App. Ct. 2005)

facie case of personal jurisdiction. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782-83 (7th Cir. 2003). I must resolve conflicts between the parties' written submissions in favor of CCorp, but once Defendant FEX "has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, . . . [CCorp] must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Id.* at 783. In other words, although I must resolve "factual disputes in the pleadings and affidavits in favor of the party asserting jurisdiction," I must also "take . . . as true those facts contained in the defendant's affidavits that remain unrefuted by the plaintiff." *C.S.B. Commodities, Inc. v. Urban Trend (HK) Ltd.*, No. 08 C 1548, 2009 WL 57455, *3 (N.D. Ill. Jan. 7, 2009) (citing *Jamik, Inc. v. Days Inn of Mount Laurel*, 74 F. Supp. 2d 818, 821 (N.D. Ill. Nov. 30, 1999).

## III. ANALYSIS

Section 2-209(a) of the Illinois long-arm statute confers jurisdiction over a foreign defendant who has committed any one of the specified actions. 735 ILL. COMP. STAT. 5/2-209(a). Jurisdiction conferred in this manner is specific, and the cause of action alleged by the plaintiff must arise from the action that forms the basis of jurisdiction. *Id.* Plaintiff maintains that FEX has subjected itself to this court's jurisdiction on two separate bases under 735 ILL. COMP. STAT. 5/2-209(a): (1) FEX transacted business in Illinois; and (2) this action arises out of the "making or performance of a contract or promise substantially connected" with the State of Illinois. For the following reasons, I find that this Court may appropriately exercise personal jurisdiction over Defendant FEX because FEX has transacted business in Illinois and has purposefully established minimum contacts.

A contract between a state resident and a non-resident does not automatically establish sufficient minimum contacts for personal jurisdiction. *Citadel Group Ltd.*, 536 F.3d at 761. When specific jurisdiction arises out of a contract, a court must consider "the parties' 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing' in determining whether there were sufficient minimum contacts." *Id.* (quoting *Burger King*, 471 U.S. at 479). When evaluating these factors, the district court may consider: (1) who initiated the transaction; (2) where the contract was entered into; (3) where the performance of the contract was to take place; and (4) where the contract was negotiated. *Id*. at 762. A choice of law provision alone, while relevant, is insufficient to provide a basis for jurisdiction. *Bolger v. Nautica Intern. Inc.*, 861 N.E.2d 666, 671 (Ill. App. Ct. 2007).

CCorp maintains that FEX has conducted business in Illinois such that jurisdiction is appropriate. FEX has consistently agreed to Illinois choice of law provisions, sent more than a thousand emails to CCorp personnel, held weekly conference calls, wired payments to Chicago accounts, and sent executives to Chicago on three separate occasions. According to CCorp these contacts demonstrate that Defendants have maintained an ongoing business relationship with an Illinois company and has availed itself of Illinois law. Furthermore, Plaintiff argues, Defendant initiated the transaction, certain of the contract terms were negotiated in Chicago, and the parties contemplated performance in Illinois.[3]

---

[3] Plaintiff raises these factual assertions in support of its argument that the agreement at issue was substantially connected with Illinois. While the court in *Viktron Ltd. P'ship v. Program Data Inc.*, 759 N.E.2d 186, 193-95 (Ill. App. Ct. 2001) found these factors to be applicable in a "substantial connection" analysis, they are more often raised in determining whether a defendant has sufficiently transacted business in the state. *Id.* at 193. For this reason, I will include them here.

It is undisputed that Defendant initiated the transaction. This factor weighs in favor of jurisdiction. It is also undisputed that each party executed the contract at its own place of business. This factor weighs against jurisdiction over Defendant.

Defendants dispute Plaintiff's assertion that negotiations took place in Illinois as conclusory and unsupported by the record. However, in his declaration, Kevin McClear, General Counsel of CCorp, notes that on April 13, 2007, he met with Ted Pretty in Chicago to negotiate terms for the CSA. An April 13, 2007, email from CCorp VP of Business Development Charles McElhenie entitled "My notes from FEX lunch" lists points to be included in a "revised term sheet." These points include: (1) a $1 million development fee; (2) a $2 million annual fee; (3) an exclusivity provision; (4) an intention to sign a binding LOI; (5) a payment schedule for the negotiation term; and (6) a target launch date. All of these terms appear in the May 11, 2007 LOI, and the first three appear again in the CSA. It is difficult to see how what took place at the April 13 meeting was not a negotiation of contract terms, and the record supports such a characterization. Because an activity in furtherance of the making of a contract while Defendant is present in Illinois may in itself be the transaction of business under the statute, this factor weighs in favor of jurisdiction. *See Berndorf Belt Systems, Inc. v. Ascona Food Group*, 1998 WL 851496, at *4 (N.D. Ill. Dec. 3, 1998) (citing *D.S. America (East), Inc. v. Elemendorf Grafica, Inc.*, 654 N.E.2d 472, 477 (Ill. App. Ct.1995).

As to performance, Defendant maintains that it was not required to engage in any activity in Chicago, and that based on the language of the CSA, FEX cannot be said to be aware of where any of the processing would occur. In its application to obtain an Australian Market License, FEX acknowledged that all trades conducted by the exchange would be "cleared and settled

8

using physical infrastructure in the United States." Neither the application nor the CSA specifically mentions Illinois as site of performance. But FEX concedes that in 2006, on a trip to the United States, Brian Price visited Chicago and conducted an investigation of CCorp's clearing and settlement facilities. This supports the inference that FEX contemplated performance of at least part of the agreed upon services in Illinois.[4] This factor also weighs in favor of jurisdiction.

Although standing alone, a choice of law provision "is insufficient to confer personal jurisdiction[,]" *Sungard Data Systems, Inc. v. Central Parking Corp.*, 214 F. Supp. 2d 879, 882 (N.D. Ill. 2002), it does demonstrate that Defendant meant to invoke the benefits and protections of Illinois law, and is a relevant factor to consider. *Bolger*, 861 N.E.2d at 671.

---

[4] Defendants cite *Asset Allocation and Mgmt. Co. v. Western Employers Inc. Co.*, 892 F.2d 566, 569 (7th Cir. 1989) in support of the proposition that jurisdiction should be based upon the defendant's performance and not the plaintiff's. I agree that Plaintiff's performance of a service in Illinois alone is not dispositive of the issue of jurisdiction over Defendant, but it is a factor to be weighed. Even if the location of Plaintiff's performance is viewed as irrelevant, the fact that FEX initiated the transaction, sent employees to negotiate contract terms, sent independent contractors to assess capabilities, and agreed to a choice of law provisions weighs strongly in favor of the exercise of jurisdiction over Defendant. Furthermore, even after the CSA was executed, Brian and Tom Price traveled to Chicago and met with CCorp concerning performance of the CSA.

A review of all of the factors support the conclusion that FEX was transacting business in Illinois and that the exercise of personal jurisdiction is appropriate here.[5] For the foregoing reasons, Defendant's motion to dismiss is denied.

ENTER:

_James B. Zagel_
James B. Zagel
United States District Judge

DATE: February 18, 2010

---

[5] The court in *Viktron Ltd.*, 759 N.E.2d at 193-194 examined similar factors in its analysis of whether a contract was substantially connected with Illinois, namely: "(1) who initiated the transaction, (2) where the contract was formed, and (3) where performance was to take place." Because I have already addressed these factors and found a substantial connection with Illinois, I conclude that this would be an appropriate alternate basis for jurisdiction under the Illinois long-arm statute.